UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Ahmed Zakee Abdullah, | File No. 23-cv-121 (ECT/DTS) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Adam Lepinski, *in his individual capacity as an officer of the Minneapolis Police Department*, Justin Young, *in his individual capacity as an officer of the Minneapolis Police Department*, and the City of Minneapolis, | |
| Defendants. | |

---

Oliver E. Nelson, III, Magna Law Firm, LLC, Minneapolis, MN, for Plaintiff Ahmed Zakee Abdullah.

Gregory P. Sautter and Tracey Fussy, Minneapolis City Attorney's Office, Minneapolis, MN, for Defendants Adam Lepinski, Justin Young, and the City of Minneapolis.

---

In this § 1983 case, Plaintiff Ahmed Zakee Abdullah alleges that Defendant Adam Lepinski, a Sergeant with the Minneapolis Police Department, used and conspired to use excessive force in violation of the Fourth Amendment when he aimed his service weapon at Mr. Abdullah for roughly ten seconds during an investigative stop.[1]  Mr. Abdullah also

---

[1] After reviewing body-worn camera video of the incident, Mr. Abdullah concedes that the second individual Defendant named in the Complaint, Officer Justin Young, did not violate Mr. Abdullah's Fourth Amendment rights.  Mr. Abdullah's claims against Officer Young will be dismissed on this basis.

asserts a *Monell* claim against the City of Minneapolis on the theory that Sergeant Lepinski's action in aiming his firearm at Mr. Abdullah occurred pursuant to City policy.

Defendants seek judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and their motion will be granted. The case's basic issue is whether, consistent with the Fourth Amendment, an officer may aim his firearm at an armed-but-compliant suspect during the brief time it takes officers to disarm the suspect and control the scene. The Parties agree that the case's facts are established by construing video from the officers' body-worn cameras in Mr. Abdullah's favor. Applying Eighth Circuit precedents to those facts shows that no Fourth Amendment violation occurred. The absence of a Fourth Amendment violation triggers dismissal of the conspiracy and *Monell* claims. Regardless, Mr. Abdullah has not plausibly alleged the existence of a policy that might support his *Monell* claim.

I

Before describing the facts, it is helpful to make clear where those facts may come from and why. A Rule 12(c) motion for judgment on the pleadings is assessed under the same standard as a Rule 12(b)(6) motion. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Under the familiar Rule 12(b)(6) standard, a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).

Defendants support their Rule 12(c) motion by relying on video taken by officers' body-worn cameras and a police report. The body-worn-camera video will be considered.

2

Mr. Abdullah does not dispute the authenticity or completeness of the video, and he agrees that body-worn-camera video of the at-issue investigative stop appropriately may be considered. Consideration of this video is therefore in line with ordinary federal court practice. *See Ching v. City of Minneapolis*, 629 F. Supp. 3d 925, 933 (D. Minn. 2022) (citing cases), *rev'd on other grounds*, 73 F.4th 617 (8th Cir. 2023). The police report is a somewhat different matter. The Eighth Circuit and district courts within the Eighth Circuit have been skeptical about considering police reports at the motion-to-dismiss stage. *See LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021) ("[The defendant] asks us to consider the police report, which he claims is appropriate because it was referenced in the pleadings. But he does not simply want us to consider the police report's existence. He also wants us to accept its narrative as truth. Thus, he asks us to accept as *fact* his own assertion that the dogs growled when they came toward him."); *see also Ching*, 629 F. Supp. 3d at 933 (declining to consider a police report at the motion to dismiss stage). Here, though Mr. Abdullah does not dispute any facts in the police report, *see generally* Pl.'s Mem. in Opp'n [ECF No. 19], the police report will be cited only as background, and all dispositive facts will be drawn from the body-worn-camera footage.

When events are captured by a videotape, these facts will be viewed in the light depicted by the videotape, setting aside versions of the facts that are "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see, e.g.*, *Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015). Inconclusive video evidence must be construed in the plaintiff's favor. *See Sok Kong Tr. for Map Kong*

*v. City of Burnsville*, No. 16-cv-03634 (SRN/HB), 2018 WL 6591229, at *9 (D. Minn. Dec. 14, 2018), *rev'd and remanded on other grounds*, 960 F.3d 985 (8th Cir. 2020).

II

Now turn to the facts. Sergeant Adam Lepinski, Officer Justin Young, Lieutenant Jeffrey Waite, and Sergeant Andrew Schroeder are members of the Minneapolis Police Gun Investigation Unit. ECF No. 4 at 23. At approximately 11:12 a.m. on November 2, 2021, Sergeant Lepinski entered a Subway restaurant in North Minneapolis, wearing plainclothes, to get lunch. *Id*. When Sergeant Lepinski entered the Subway, Mr. Abdullah was in line to get a sandwich. *Id*.

As Mr. Abdullah paid, Sergeant Lepinski spotted the "butt of a handgun sticking out of [Mr. Abdullah's] right jacket pocket." *Id*. Mr. Abdullah left the Subway and sat in the driver's seat of a black SUV. *Id*. Sergeant Lepinski returned to his police cruiser and relayed this information to Officer Young, Lieutenant Waite, and Sergeant Schroeder. *Id*.

Officer Young arrived first at 11:22 a.m., with his body-worn camera activated. ECF No. 14-1 ("Young Vid."). Officer Young parked his police cruiser behind Mr. Abdullah's SUV. Young Vid. at 11:22:00–01. Lieutenant Waite parked a second police cruiser slightly behind and to the passenger side of the SUV. ECF No. 14-3 ("Waite Vid.") at 11:21:58–22:01.

Officer Young exited his vehicle with his gun unholstered but with the muzzle pointed toward the ground. Young Vid. at 11:22:01–05. Keeping the front of his police cruiser between himself and Mr. Abdullah, Officer Young loudly commanded, "driver, put

4

your hands up." *Id*. at 11:22:05–08.  Mr. Abdullah complied immediately, raising his hands above his head.  *Id*. at 11:22:08.

Seeing Mr. Abdullah raise his hands, Officer Young walked toward the SUV with his gun still pointed at the ground.  *Id*. at 11:22:09–10.  As Officer Young approached the front driver's-side door of the SUV, he said "[Mr. Abdullah's] complying with my orders." *Id*. at 11:22:10–11.

Meanwhile, Lieutenant Waite exited his police cruiser and walked to the passenger's-side door of the SUV with his gun holstered.  Waite Vid. at 11:22:03–10. (Lieutenant Waite never unholstered his gun during the stop.  *See* Waite Vid.)  Around the same time, Officer Lepinski parked a third police cruiser behind Officer Young's vehicle with his body-worn camera activated.  ECF No. 14-2 ("Lepinski Vid.") at 11:22:05. Officer Lepinski got out of the police cruiser and jogged toward the SUV.  *Id*. at 11:22:06–15.

When Officer Young reached the front driver's-side door of the SUV, he opened the door slightly with his left hand.  Young Vid. at 11:22:15.  When Officer Young opened the driver's-side SUV door, the gun in his right hand was pointed down.  *Id*.  After cracking open the door, Officer Young instructed Mr. Abdullah to "just keep your hands on top of your head for me ok."  *Id*. at 11:22:15–18.  Mr. Abdullah complied, moving his hands from straight up to on top of his head, and he told the police he was complying.  *Id*. at 11:22:18. "Keep them there," Officer Young repeated, as he opened the driver's-side door further and placed his left hand on top of Mr. Abdullah's crossed hands.  *Id*. at 11:22:18–22.

5

As Officer Young placed his hand on top of Mr. Abdullah's crossed hands, Sergeant Lepinski reached the driver's side of the SUV, stopping a few feet behind Officer Young. Lepinski Vid. at 11:22:17–19. Sergeant Lepinski unholstered his gun but kept it pointed at the ground. *Id*. at 11:22:18–19; Young Vid. at 11:22:21–22.[2] Officer Young holstered the gun in his right hand, Lepinski Vid. 11:22:20–21, asking Mr. Abdullah "what's your name." *Id*. at 11:22:21. Mr. Abdullah responded "Ahmed," and Officer Young placed his right hand on top of Mr. Abdullah's crossed hands. *Id*. at 11:22:22. Officer Young told Mr. Abdullah to "step on out Ahmed," quickly repeating "step out." *Id*. at 11:22:23–24.

As Officer Young started moving Mr. Abdullah out of the SUV, Sergeant Lepinski warned Mr. Abdullah, "don't mess around bro," with his gun drawn but pointed at the ground. *Id*. at 11:22:25–26. Mr. Abdullah responded, "I'm complying, I'm complying." *Id*. at 11:22:27–28. Sergeant Lepinski warned Mr. Abdullah again, "don't mess around." *Id*. at 11:22:28. Officer Young slowly moved Mr. Abdullah out of the SUV, keeping his grip on Mr. Abdullah's hands crossed on top of his head. *Id*. at 11:22:28–31.

As Mr. Abdullah stepped out of the SUV, Sergeant Lepinski raised his gun slightly to point it more directly at Mr. Abdullah but kept the muzzle of his gun angled down. *Id*. at 11:22:28–32. Officer Young then instructed Mr. Abdullah to "face away from me." *Id*. at 11:22:33. At this time, Sergeant Lepinski raised his gun high enough to be outside of the frame of his body-worn camera and warned Mr. Abdullah again, "don't mess around."

---

[2]   Officer Young's body-worn camera and Officer Lepinski's body-worn camera are not synchronized. Officer Young's body-worn camera is approximately three seconds ahead of Officer Lepinski's body-worn camera.

6

*Id*. at 11:22:34–35.  When Sergeant Lepinski's gun returns into view, it is angled slightly downwards.  *Id*. at 11:22:35.[3]  Officer Young told Mr. Abdullah a second time to "face away from me."  *Id*.  As Mr. Abdullah completed the turn to face toward the SUV, hands still over his head, he told the officers, "I'm trying to figure out what's going on."  *Id*. at 11:22:36–38.

Officer Lepinski continued to point his gun at Mr. Abdullah with his right hand as he took the gun from Mr. Abdullah's jacket pocket with his left hand.  *Id*. at 11:22:39–40; Young Vid. at 11:22:43.  Seconds later, Officer Lepinski holstered his gun, Lepinski Vid. at 11:22:42–43; Schroeder Vid. at 11:22:44–45, while searching Mr. Abdullah's jacket pocket with his left hand.  Lepinski Vid. at 11:43–44.

Officer Young moved Mr. Abdullah's hands behind his back and handcuffed him with assistance from Lieutenant Waite.  Waite Vid. at 11:22:43–56.  After Officer Young handcuffed Mr. Abdullah, the officers left him standing behind the SUV and talked to him while Officer Young searched Mr. Abdullah's wallet for a permit card granting Mr. Abdullah legal authority to carry the firearm.  Young Vid. at 11:23:00–24:18.  The officers found an expired permit-to-carry card, Young Vid. at 11:24:18, but not a current one, and released Mr. Abdullah on the scene.  ECF No. 4 at 14.  Mr. Abdullah was later charged for carrying a pistol in public without a valid permit, in violation of Minnesota Statute § 624.714, subd. 1a.  *Id*. at 48.

---

[3]   No body-worn camera gives a clear view of where Sergeant Lepinski's gun is pointed at this time.  Sergeant Schroeder arrived on the scene at 11:22:30, but Sergeant Lepinski's body is in between Sergeant Schroeder's body-worn camera and Sergeant Lepinski's gun.  ECF No. 14-4 ("Schroeder Vid.") at 11:22:30–40.

III

Defendants' motion for judgment on the pleadings presents the following issues: (A) whether Sergeant Lepinski used excessive force during the stop by pointing his gun at Mr. Abdullah;[4] (B) whether Mr. Abdullah states a viable § 1983 conspiracy claim; and (C) whether Mr. Abdullah states a viable *Monell* liability claim against the City. The answer to each is question is no, and therefore Defendants' motion for judgment on the pleadings will be granted.

A

Sergeant Lepinski seeks dismissal of Mr. Abdullah's § 1983 claims based on qualified immunity.[5] To determine whether individual officers are protected by qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted). Courts, in their sound discretion, may consider the questions in either order, but a § 1983 plaintiff can defeat a

---

[4] The Complaint alleges that Officer Young and Sergeant Lepinski violated Mr. Abdullah's "well-settled rights to be free from unreasonable searches and seizures, pursuant to the Fourth [Amendment]." Compl. [ECF No. 1] ¶ 19. Mr. Abdullah's briefing clarifies he does not dispute the constitutionality of the stop and that he asserts only an excessive-force claim tied to Officer Lepinski's use of his service weapon. Pl.'s Mem. in Opp'n at 5.

[5] Defendants frame the reasonableness of Sergeant Lepinski's use of force as a separate issue from qualified immunity. *See* Defs.' Mem. in Supp. [ECF No. 12] at 11–21. Here, the discussion of a Fourth Amendment constitutional violation is placed under the framework of qualified immunity.

8

claim of qualified immunity only if the answer to both questions is yes. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Start with the first question—did Sergeant Lepinski violate Mr. Abdullah's Fourth Amendment rights by using excessive force? The Fourth Amendment includes the right to be free from excessive force during an investigative stop and arrest. *Brown*, 574 F.3d at 496. "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Id*. (citation omitted). Under that standard, the Court must evaluate all of the facts and circumstances surrounding the use of force, "careful[ly] balancing . . . the nature and quality of the intrusion on [Mr. Abdullah's] Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and internal quotation marks omitted). "Once the predicate facts are established, the reasonableness of the [officer's] conduct under the circumstances is a question of law." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (citation omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

Mr. Abdullah contends that Sergeant Lepinski violated his Fourth Amendment rights by pointing a gun at Mr. Abdullah when Mr. Abdullah was complying with orders and was "completely restrained." Pl.'s Mem. in Opp'n at 5. True, pointing weapons at a suspect during an investigatory stop or arrest can constitute excessive force. *Rochell v.*

9

*City of Springdale Police Dep't*, 768 F. App'x 588, 589–90 (8th Cir. 2019) (per curiam); *Wilson v. Lamp*, 901 F.3d 981, 989–90 (8th Cir. 2018). But context is key, and courts in the Eighth Circuit have found that pointing weapons at a suspect constitutes excessive force in limited circumstances.

In *Rochell*, the plaintiff exited his house, armed with an AR-15, and walked toward an undercover detective's truck. *Rochell v. City of Springdale, Arkansas*, No. 5:16-cv-5093, 2017 WL 4817883, at *2 (W.D. Ark. Oct. 25, 2017). The detective exited the truck with his service weapon unholstered and ordered the plaintiff to drop the AR-15. *Id*. The plaintiff complied. *Id*. The detective then advanced on the plaintiff, loudly ordering him to get on the ground and pushing the plaintiff forcefully down. *Id*. at *3. With the plaintiff on the ground face down, hands behind his back, the detective pressed his gun to the plaintiff's head and threatened to blow his brains out. *Id*. The district court held the detective's conduct was not protected by qualified immunity. *Id*. at *9. On appeal, the Eighth Circuit affirmed, concluding "a police officer uses excessive force by pointing his service weapon at the head of a suspect who has dropped his weapon, has submitted to arrest, and no longer poses an immediate threat to the safety of officers or others." *Rochell*, 768 F. App'x at 589.

Sergeant Lepinski's conduct was materially different. *See* Lepinski Vid. at 11:22:15–23:30. Sergeant Lepinski kept his gun pointed down, only raising it toward Mr. Abdullah as Officer Young moved Mr. Abdullah out of the SUV and turned him around to face the SUV. *Id*. at 11:22:18–40. The body-worn camera footage does not always show where Sergeant Lepinski's gun is aimed, but inferring—in Mr. Abdullah's favor—that it

10

was directly pointed at Mr. Abdullah's head for a few seconds and otherwise pointed at him for nine seconds, this is not enough. *Id*. at 11:22:31–40.[6] Unlike the detective in *Rochell*, Sergeant Lepinski holstered his weapon almost immediately after taking the gun from Mr. Abdullah's pocket. *Id*. at 11:22:39–43. By comparison, the detective in *Rochell* pressed his service weapon against the plaintiff's head after the plaintiff had dropped his AR-15. Furthermore, Sergeant Lepinski pointed his weapon only while Mr. Abdullah was being moved from the SUV, and while the handgun remained in Mr. Abdullah's pocket, *id*. at 11:22:30–40, whereas the detective in *Rochell* continued to point his weapon when the plaintiff was prone on the ground, disarmed, hands behind his back. Nor did Sergeant Lepinski threaten, yell at, or push Mr. Abdullah during the stop. *Id*. The contrast is stark.

*Wilson v. Lamp* serves Mr. Abdullah no better. 901 F.3d 981 (8th Cir. 2018). In *Wilson*, officers were surveilling a park to arrest a convicted child molester with multiple outstanding arrest warrants. *Id*. at 985. The officers stopped a truck and approached it with guns drawn. *Id*. The officers recognized the driver as the child molester's brother and the passenger as the brother's child. *Id*. Nonetheless, the officers ordered them out of the vehicle, conducting a patdown of the brother before searching the truck. *Id*. Throughout the stop, at least one weapon was pointed at the brother and child. *Id*. The court concluded the continued pointing of guns after identifying the occupants and conducting a patdown was an excessive use of force. *Id*. at 990.

---

[6] Mr. Abdullah contends "[a]ll in all, Officer Lepinski's body cam shows him pointing his firearm either towards or at Abdullah for approximately 8-9 seconds." Pl.'s Mem. in Opp'n at 4.

11

Unlike *Wilson*, where officers pointed weapons at an identified suspect for the duration of a search, Sergeant Lepinski unholstered his gun for less than 30 seconds in total, *see* Lepinski Vid. at 11:22:15–40, and only pointed his gun at Mr. Abdullah for a fraction of that time. *See id.* at 11:22:30–40. Furthermore, the police in *Wilson* kept pointing weapons at the suspect after confirming he was unarmed by patting him down, whereas Sergeant Lepinski only kept his weapon unholstered when he knew Mr. Abdullah had a gun on his person. The critical circumstances that made pointing a gun during a stop unreasonable in *Wilson*—duration and lack of danger—are not present in this case.

Instead, Sergeant Lepinski's conduct follows the long line of cases where the Eighth Circuit has found that pointing or brandishing a gun during a stop is reasonable when officers have a legitimate law enforcement purpose. *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022) ("It is well established that officers may reasonably draw weapons during a Terry stop when the defendant is suspected of carrying a weapon—even if the defendant is otherwise cooperative."); *Pollreis v. Marzolf*, 9 F.4th 737, 748 (8th Cir. 2021) (holding that an officer did not use excessive force by pointing a gun at suspects on the ground with their hands over their heads for two minutes while waiting for backup); *Clark v. Clark*, 926 F.3d 972, 979 (8th Cir. 2019) ("A reasonable officer was justified in believing the situation was not fully under control until [the suspect] had been removed from the vehicle, patted down, and restrained."); *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). Officer Lepinski had a legitimate law enforcement purpose to point his firearm at Mr. Abdullah for a short period of time while Officer Young moved Mr. Abdullah out of

12

the SUV with the gun still on his person. Sergeant Lepinski did not use excessive force during the stop and arrest of Mr. Abdullah.[7]

B

Mr. Abdullah asserts a § 1983 conspiracy claim. Compl. ¶ 18. To prove a § 1983 conspiracy claim, a claimant must show: "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *Ryno v. City of Waynesville*, 58 F.4th 995, 1006 (8th Cir. 2023) (quoting *White v. McKlinley*, 519 F.3d 806, 814 (8th Cir. 2008)). The plaintiff must also prove the underlying constitutional violation. *Id*. Here, the absence of an underlying constitutional violation negates Mr. Abdullah's § 1983 conspiracy claim.

C

Mr. Abdullah also brings a *Monell* liability claim against the City of Minneapolis. *Monell's* basic rule is "that civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 30–31 (2010). In other words, a municipality cannot be held liable under § 1983 because it employed a tortfeasor, but it may "be sued directly under § 1983 for monetary, declaratory, or injunctive relief . . . [only if] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that

---

[7] Because Mr. Abdullah's constitutional rights were not violated, it is not necessary to reach the "clearly established" prong of the qualified immunity analysis.

body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Municipalities also "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id*. at 690–91. Thus, the "first inquiry in any case alleging municipal liability under § 1983 is . . . whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). For a municipality to be liable under *Monell*, there must be individual liability on an underlying substantive claim. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007) (citation omitted).

As discussed above, Sergeant Lepinski did not violate Mr. Abdullah's constitutional rights by using excessive force, and Mr. Abdullah acknowledges Officer Young did not violate his constitutional rights. Because no Minneapolis Police Officer violated Mr. Abdullah's constitutional rights, *Monell* liability cannot attach to the City.

Regardless, Mr. Abdullah fails to plead sufficient facts to plausibly support a *Monell* claim. Courts must accept as true all factual allegations set out in the complaint, *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009), but conclusory statements are not considered. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007). Mr. Abdullah's allegations regarding the City are conclusory. *See, e.g.*, Compl. ¶ 26 ("Before November, 2, 2021, Defendant City of Minneapolis, with deliverable indifference to the rights of its citizens, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern, and practice on the part of its police personnel, including Defendant Officers of

performing unreasonable and unconstitutional searches, seizures, using excessive force, and other unconstitutional conduct described above."). Mr. Abdullah does not identify any specific policies, customs, or conduct by the City of Minneapolis. *See id*. ¶¶ 24–28. Thus, if there were an underlying substantive violation, the Complaint nonetheless lacks sufficient factual allegations to state a *Monell* claim against the City.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendants' Motion for Judgment on the Pleadings [ECF No. 11] is **GRANTED**.

2. The Complaint [ECF No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: August 25, 2023                              s/ Eric C. Tostrud
                                                    Eric C. Tostrud
                                                    United States District Court